May it please the court, my name is Maris Liss, I represent Edgar Archila, I recently came into this case on a pro bono basis to handle an oral argument, and I would like to give you three minutes for a rebuttal. I'm going to tell you my four points, just like a summary of them, and then the first one I'm actually going to probably dispose of, just going through the overview, give you an overview of the three, and then go into each of the three points I have. You know where I'm going, and you don't have to worry about whether I'm going to bring something up, or you can tell me if I didn't bring up something you really care about. Here's what I care about, the first thing I care about is that when you turn away from the microphone, I lose your voice, so if you could help me out, thank you. My computer, so I have one page of videos, and everything else is on the computer, so I'm going to be looking away while I say anything. Ms. Liss, do you by chance have any headphones, or you know, or? I'm sorry, and I'll talk loud, does that help? Another thing, I can put my phone into the video, for the audio, would you like me to do that? The phone line might be better than the computer line, but you still have my video. Well, right now I can hear you, but I just am afraid, why don't we go ahead and try it, and I'll call on Ms. Banfield if we have trouble, okay? Sure, my first point is that the standard of review should be de novo about whether the person in the bar applies. I noted that in the petitions over the brief, a lot of the points say abuse of discretion, it was abuse of discretion, but there was an intervening Supreme Court case, Guerrero v. Barr, that says that mixed questions of law and fact are reviewed de novo, and there's no question that my client was credible, the respondents believe, like, it says that there's a mixed question of law and fact, and it also says that my client was credible under the pre-real ID, and also the real ID. So counsel, if we agree with you about all of that, why wouldn't the bar apply, reviewed de novo? Oh yeah, okay, so that's my next point, my next point, so I'm not going back to that. So first of all, I'm going to show you that the definition of persecution has to be the same if somebody's applying for asylum, like what constitutes persecution, and also if somebody is going to be on the bar because of the persecution bar, and that's one point. The next point is that the government didn't even consider the burden of shifting the persecutor analysis to my client, and the final point is that even if the burden was shifted, my client met the bar. So I'm going to, I'm going to have, I'm really having trouble hearing you, and this is, you know, obviously very important. So Ms. Mary, what would you do with Ms. Liss to hear her? Should she appear by phone like our earlier counsel? Absolutely. Because she sounds like she's underwater. Yes. Do you have the phone number? Let me get my, I don't have the handset of my phone because I didn't want it to ring during argument. Can I just run over and get my phone? Whatever you need to do to go ahead and get it. I have to run over. I'm going to be right back. Now, on the, by the mute button, we're talking, we're just, it's the phone audio. Can I use that and type in what it tells me? I would just call in using the telephone. You can keep your video visible, but use the dial-in number that's on the Zoom invitation that has the link to the oral argument. Welcome to Zoom. Enter your email address. Enter your participant ID, followed by pound. Please. You entered 161520. This meeting password is invalid. Please re-enter the meeting password, followed by pound. You are in the meeting. There are nine participants in the meeting. Hi, can you hear me? Yes. Is that better? Put the phone up to your ear. Please. Can you hear me better? Much better. Yes, I think so. I hope there's not an echo, but go ahead. Let's try this. Okay. Okay. All right. So, I already did my first point, which was the standard of review. Now, I'm going to, the fact that, you know, persecution definition in your decision should be a two-way street. So, the same thing that's defined as persecution when somebody applies for asylum and then, let's say, denied asylum, should be the same for the persecutor bar. So, what do I mean by that? I mean, you have a line of cases in the Ninth Circuit where people, like in Gu versus Gonzalez, brief detention, beating, and interrogation did not compel a finding of past persecution. People engaged in physical, were victims of physical violence, and they did not get persecution. HACSA, harassment, threats, and one beating did not compel that the person was suffered past persecution. And one more case I'll mention, Prasad, minor abuse of an Indo-Fijian during a 46-hour detention did not compel finding of past persecution. My client did not actually do any violence on anybody, didn't arrest or detain anybody. So, I'm just, like, contrasting it. Now, on the other hand, this court has some cases like Mendez Gutierrez, where vague and And in Ramadan, this is the last case I'm going to mention now, like, threats of harm were too speculative. Now, my client testified credibly that he simply talked to people. And if somebody came to America and applied for asylum and said that somebody simply talked to them, that person would not get asylum. So, can I ask you? Oh. Can I ask you? Judge Sessions, before you do, if Ms. Aigo, Aigo, is it Aigo? Aigo, yes. Can you put yourself on mute while Ms. Lis is talking? That might help a little bit. Thank you so much. Judge Sessions, go ahead. So, if you look at how the persecution bar is defined, it covers anyone who has assisted others or encouraged or incited persecution against other people. Now, your client testified at a hearing in which he indicated that he was a military commissioner in Guatemala, that he also was the head of the civil defense unit of this particular area of Guatemala, and that he, as a part of his military commission responsibilities, would learn from various people in the community where guerrillas were located and that he would turn over that information to the military. And he said, according to his own words, he did not engage in any kind of physical persecution or death squads, etc., but what he said was, oftentimes, when he told the military about the location of guerrillas, that they would disappear, and that he was aware that they would disappear and never come back. Now, the definition of persecution bar includes assisting others in the persecution of people. So, tell me whether his admissions during the course of this hearing constituted, essentially, admissions to the application of the persecution bar. Well, thank you, Your Honor. We don't know whether what his intelligence was led to the supposed disappearance, okay? So, we don't know what the person was involved in or what other information was acted on. What I would say is that if you look at Archilla's testimony about... Am I muted? No. You're not muted? No, you're doing fine. If I can clarify, I think Judge Sessions is following up on a really important point, for what it's worth. My notes match. Your client said, sometimes people went away from their villages and never came back. Your response now to Judge Sessions talked about the person. My understanding, just to clarify, I think we're talking about many people, multiple people, not just one. Is that right? Well, what I would like to say is that... This is just a yes or no. You're using the singular, and I just want to know if you're doing that intentionally. I will use the plural to match the testimony, okay? Thank you. We don't know if whatever was acted on was only related to what Archilla collected, but also Archilla testified that he was collecting information to protect two bridges and also to find out about imminent attacks on where weapons stashes were. Let's say protecting a bridge is not a protected ground. Not only does there have to be persecution, but persecution on account of a protected ground. There are cases where there's a land dispute, a property dispute, or somebody wants money, and we say, oh well, you're not going to get asylum for that because you weren't persecuted on account of a protected ground. And one of his main jobs was protecting two bridges. I don't know if people disappeared because of that, but that is not a protected ground either. Okay, so can I ask you about that? So when you have a persecution bar, there is one large exception to the application of the persecution bar, and that is in defense. And this is a very interesting case because apparently your client not only was a military commissioner and that there's some evidence to suggest that they were really at the heart of the persecution, but he also was in civil defense of his village. And he was in civil defense of his village against the guerrillas. And so as a part of his civil defense work, during the course of a civil war, which is going on between the guerrillas and the Guatemalan army at this point, he's giving information to the Guatemalan army. Is he giving information to persecute those people or is he giving information to defend the village from the attack of these particular guerrillas, which is the second part of his responsibility. Do you know what is going on here when he testifies that he in fact is making these statements about giving this information to the military and having people disappear? I don't know more than what's in the record. But what I would say is that, you know, it sounds to me from the record that there was a lot of civil defense that he was involved in. And one of the things that the government has to show to shift the burden is that an individual, you know, was persecuted. And we don't know that any individual was persecuted, you know, based on what is actually in the record. And also there's like an idea in your case law about a continuum and how remote somebody is. So, you know, let's say somebody was, you know, people. Let's say people were disappeared, okay? You know, he didn't touch anybody. He didn't detain anybody. He didn't arrest anybody. He was very far in the continuum. Wait a minute. Hold it. Hold it. Forgive me, but he was very far in the continuum. It's undisputed, I think, on this record. He didn't touch anybody, and it's also undisputed. Our case law doesn't require that he touch somebody. So let's focus on this point. You just said he was very far in the continuum. My notes may be wrong, but my review of the record indicates that he admitted to telling members of the military about certain people. And then he said they sometimes went away from their villages and never came back. So what's very far away? It sounds to me like he's the next step in the link in the chain there. But I don't know if it was the reason that they disappeared was on account of what he said. I don't know what the, you know, I don't know what the connection is. I'll tell you, this court has two recent cases since after briefing. One was called Christic, and in that case the government did not present evidence that the witness, that, you know, the person, like, witnessed war crimes. My client didn't witness war crimes. You know, and he also was not present in planning and citing of any of the, you know, whatever disappearances that, you know, you're talking about or executions. And that is why he is more remote. He is more remote the same way Christic is. And I can send you a letter briefed with that citation. And there's also a recent case called Rodas. And Rodas was also a person that you found that the persecutor bar did not apply. It's also after briefing. And he was actually in doing military work during the same era in Guatemala. And he actually arrested people. And those people also, you know, may have disappeared or whatever. But you still found that there was too tenuous a connection to invoke the persecutor bar. And so I think that our case is closer to that. I mean, you know, the guy worked in the military. Oh, the name of that case is Rodas v. Bar, 2020 U.S. App Lexus 30894. But I will send you a letter with that. Okay. Can I just ask you another question, which is not directly related, but it is directly related. And that's about the CAT, the Convention Against Torture. So your client was shot in 1981. He says he was shot by the military. He was kidnapped in 1987. He then was almost executed in a car and thrown while he jumped out and was shot again when he was out on the ground. And he's saying that the military is shooting him. Okay. So my first question is, is that correct? Is the military actually out to shoot him? That's first. And then the second is, this is past persecution, past torture. Is there any reason to believe that he is still at risk if he goes back? I read the letters from the family members who describe him being at tremendous risk if ever he is sent back to Guatemala. So do you have any evidence to suggest that he would be at risk if he was sent back to Guatemala? I don't. I don't specifically have any outside-the-record evidence. But I will also, in addition to the things that you cite, he also has relatives, close relatives that were, you know, I don't remember like every fact in my head. But I know that there were other relatives that also were killed, not just the terrible things that happened to him. And I also know that regimes have long memories in general. You know, recently the guy from the Hotel Rwanda movie was abducted and extradited to Rwanda. Now, this is Guatemala. It's not Rwanda. But, you know, these crazy regimes do have long memories. And even though that guy was celebrated in a movie and won every kind of humanitarian award there is, like 20 years later he was, you know, abducted like surreptitiously and is on an unfair trial in Rwanda. So that's my, you know, the only thing I can tell you about whether he's going to still be in danger. But, you know, we have to be worried about that. I guess if I could just ask another question on the Convention Against Torture. It seems like the BIA and the IJ believe that the passage of time, three decades here since Mr. Archila last suffered harm in Guatemala, meant that the threat of future harm was, you know, no longer or had somewhat dissipated. Is it your position, Ms. List, that the passage of time is irrelevant to the claim of future torture or should that be dispositive for us as the BIA or as the government has suggested? It's my position that there's nothing to rest that speculation on and that there's nothing in the record to rest that speculation on and that there's corroborating evidence that his relatives were also, you know, harshly treated, you know, killed or tortured or whatever. I don't remember the exact thing that happened to which relative. But because that is a pure conjecture and speculation, the idea of the passage of time is not based on anything. And therefore, you cannot make a decision on that. Okay, so let me ask you, what's the value of the country conditions evidence here? And I guess I just want to know, did the government submit that report? Is that the most recent support report that was in existence? And I can ask the government this as well, but I just wanted to get your view on the country conditions report that was submitted and how we should take that into account in determining the cat relief or how we should take the BIA and IJ's view of that in determining whether to grant any cat relief here. Okay, first of all, I don't think that the country report in the record is the most recent. Second of all, country reports have to be taken with a grain of salt. You know, frequently when America, and there are actually cases, I'll try to pull something after argument, where sometimes, for example, when Saddam Hussein was toppled, we declared that it is now safe for Christians to go back to Iraq. Because that was how we portrayed our country report, because we wanted to show we were a winner. And then Congress had to pass the Iraqi Refugee Crisis Act, because it turned out that Christians were not safe in Iraq. And the country reports are bogus. They often are slanted by the administration, by diplomatic reasons. And there's nothing in the country report that says that passage of time protects people. And so that is something that I hope that you'll keep in mind. Okay, thank you. Does anybody else have any questions at this point from this list? No. No, thank you. Okay, thank you. Thank you, Ms. Liss. Ms. Igo, could you please state your appearance? Good afternoon. Allison Igo representing the Attorney General. I disagree with my opponent that this is a mixed question of law and fact. I believe it's purely a question of fact that the substantial evidence standard applies to. And there's overwhelming evidence in this record supporting the application of the persecutor bar. May I ask a question right here at the outset of my notes? The Attorney General has issued a very recent opinion. I'm speaking of Attorney General Barr. I mean, a very recent opinion. And I cannot pronounce the name. Forgive me. You will know it. It's like Neguse? Neguse. Thank you. Neguse. Oh, I wasn't quite as far off as I thought. Okay, so the question is, is it the government's position that we, of course, that changes the burden of proof here in the shifting. Is it your position that we apply that or not? I don't think that it actually changed the burden of proof. I believe in that case it was a question of who bears the burden of proof. The shifting, yes. We're saying the same thing. It has always been like stated that the government has the burden of proof of producing evidence to show that the evidence that would indicate the persecutor bar may apply. But the way the regulation is written, it just says the evidence, if the evidence indicates. And what the Attorney General has said, it's not the burden of the government to actually produce the evidence. You can use whatever evidence is in the record. If it is the testimony of the petitioner, if it was documents that the petitioner put in. I'm not speaking of burden of production. I think we're miscommunicating. I'm not speaking of burden of production. Can you just tell me whether it's your position that the new standard applies? That's probably the easy way for me to ask my question. I would say I hadn't really thought about that. I would say no, it does not apply, likely. Okay, fair enough. Because of the time. Fair enough. But the statute in this case is very broad. As Judge Sessions pointed out, I mean, it takes into account not only where an alien ordered or incited, but where he assisted or otherwise participated in. Showing that Congress was really concerned with a broad range of activity. Because this is somebody who is seeking relief, which is really a gift to people who come to the country because it leads to citizenship in the United States. And also, the regulation in this that governs burdens of proof has a specific section that deals with mandatory bars. And as I mentioned before, all the evidence has to indicate is that the bar may apply. In this case, you have a person who was a military commissioner who worked with the intelligence department. And this is all admitted. He testified to this and it's in the record. He was also chief of the self-defense civil patrol in his area. That area, during the period of time when Mr. Archila served, that time and in the area, Isval in Guatemala, was known for some of the most serious human rights violations in all of the war. So, can I ask you what the responsibility of the civil defense unit was? Is that to fight the guerrillas if the guerrillas, in fact, attack the village? Is that what they do? It was a little unclear what the civil defense. I believe that's just in general in other cases that I've read that the civil defense was to protect the village. If that is the case, you would agree that if the civil war is going on, that the persecution bar does not apply. If there's a civil war, the persecution bar generally does not apply. I suppose it could be in extreme cases, perhaps it would. But if we're engaged in a battle, that's a civil war, that's not persecution. So, when you have a person like Mr. Archila at this point, who part of his job is to provide military intelligence as a military commissioner to the military, and part of his job is to defend the village in a war-like situation from the guerrillas who are right outside the village, how do you know when he's doing what job? In this case, there's overwhelming evidence of what he was doing. First of all, people who were in Mr. Archila's position, where they were both military commissioners and chiefs, the record shows that those particular people had very few parameters on their authority, and that they regularly abused that authority to the extent where they engaged in egregious human rights violations. That's number one. Number two, this record is full of examples of where these military commissioners and these chiefs of the civil defense patrols went far beyond what would be considered fair war practices, in that they gave information about just civilians and regular citizens who were seen to be sympathetic to guerrillas, who seemed to be opposed to the government. Those people were often arrested, and in fact, page 180, 181, Mr. Archila said, he was asked if you heard that a campesito, who's a peasant, was hiding weapons. How would the military deal with that? He said that he would give information to the S2, and he also testified that S2 was the most brutal division of the military. They regularly engaged in torture. They regularly killed people. He said these peasants, they were not guerrillas necessarily, and they were not military people. It was generally known that they would be taken away and that they would disappear. They would never come back. And he said, how do you know that? He said that was just information. People were well aware of that. So this is not a question of people being arrested who were guerrillas, who were opposed, who were involved in the Civil War. This swept up civilians and anybody who was suspected of not going along with the military or with the present government. Forgive me, but right there, I think I'm missing your point, and it's an important one. I'll sure go look at the record site. But I think the point you're making is this included people who were not involved and they got swept up. But on this page, this example, is this somebody who was hiding weapons for the conflict? That's why the example you're giving doesn't seem to match up unless I'm missing the point you're making. It's unclear why he was hiding weapons. But he was a peasant. He was not a guerrilla. He was not a soldier. And yet, Mr. Achilles said, yes, those people would be arrested and turned over to the DS2. And there is other evidence in the record that they also arrested civilians who they thought might have information about where guerrillas were hiding. And to get information from those people, they would be tortured or harmed in some way, and many of them disappeared. There were egregious human rights violations going on in the particular areas where Mr. Achilles served and during the exact particular time that he served. I'd like to address a couple of cases. My opponent referenced the Christick case. I argued both of the Christick cases. The first one in which the petition was granted was a fellow who worked in headquarters, and he was responsible for supply. Supply requests came in, and he fulfilled those supply requests. And the port found no definite link between the genocide that occurred in Serbia and his job as supplying weapons because there was a war going on, and he was supplying weapons. However, in the second case, Mr. Christick's brother, he was a soldier in the particular division that was involved in the genocide. There was no evidence that he shot at anybody, that he killed anyone, but he was trained in a particular weapon. He was there at the particular time, and his battalion was involved in the genocide. And the court denied the petition in that case, finding that there was sufficient evidence. In this case, and my opponent argued that, well, he didn't hurt anyone. He wasn't involved in anyone. The cases are clear that you don't have to be a trigger puller. If I could just ask Ms. Iger, I understand he doesn't have to be the trigger puller. And you're right, Mr. Archila testified that he did not personally harm anyone, and he has no way of knowing what his superiors, I think he also testified he had no way of knowing what his superiors did with the intelligence that he provided. Although he did make a reference, I think, at least on one or more occasions that they went away. I think that was attributed to him saying that. But why is that not sufficient? If he didn't personally harm, and he didn't know exactly what his superiors did, why isn't that sufficient to rebut the inference that the prosecutor bar applies here? And I guess I'm just curious, what did he need to do to rebut that inference? What could he have done? I think the inference in this case would have been very hard to rebut. He didn't need to know that any particular person that he turned over to the S2 was harmed. It was generally known that the job of the military commissioners was to root out people who had information about the guerrillas or who were otherwise opposed to the government. And without their help, and this is the chain, my opponent said, well, he's very far down the line. He wasn't very far down the line. Without his information, S2 would not have been able to locate and target those people, you know, in the way that they did. He was essential to this whole operation. And the fact that he knew generally that his job is intelligence, that people who were turned over to the S2 were tortured or who disappeared. He didn't have to know that any particular person that he turned over, and that would be an impossible burden. And in fact, the burden is, may indicate that the bar, indicates that the bar may apply. I mean, clearly here, you know, it's not that the bar does apply, that he, you know, specific evidence, it's the evidence indicates. In a case where you have overwhelming evidence that military commissioners and chiefs of patrol who particularly, I mean, these military commissioners worked in intelligence. It was their job to tell the S2 and the military intelligence department where to find these people. And he admitted to out that that's what he did. I mean, that was his job. I have two questions about cat relief here that's being sought. I guess, isn't it true that the country reports discussed conditions in the 1980s and the 1990s? And so I'm just struggling with this whole country conditions report. I'd like if you can explain why it was an older report. And how could they have demonstrated whether there was or was not a threat in 2018? And is there any, I guess, sort of evidence in the country reports that would that the threat to our Chile lessened in the past three decades? I really was struggling to find that. Well, I'm not I'm not really clear that there was a significant threat. I mean, he did testify that he was shot. It's not really clear. I mean, he said he believed that they were military people, but it's unclear why. He never explained why they would be. He didn't testify against any military. He left the country in the 1980s, and it's unclear why they would have targeted him. Well, hold on just a second, because it seems that Mr. Archila credibly testified that he suffered past torture and that he would be killed if he returned to Guatemala. But the BIA, if I understand this correctly, you know, decided or concluded that he did not face a future threat. But if we if we take that, his credibility was never there was no adverse credibility determination here. And so if we take his credible testimony is true. Why isn't that sufficient based on everything that he testified? I think Judge Sessions outlined everything that happened to this individual. I guess. Is there any I'm just trying to give you a chance to talk about that. There was never an adverse credibility determination. They were just saying, oh, we have these country reports that say in the 80s and the 90s. Yes, he would still be a risk. But it's been a while. So we're just going to decide that. I don't I don't understand what what authority that the BIA and the IJ can do that. Judge Sessions, did you want to follow up? Can I just just add just a little bit? I mean, you you you said that he never explained why the military would be after him. That's not right. Actually, there's a whole section of his testimony in which he address addresses fear from the military. He said that in 1981, when he was shot by a gang of men, he felt that was the military. His brother, when he visited his brother in 1987, who had been shot by the military, he was told the military was out shooting people because they did not want disclosure of what they had been doing in the 70s and 80s. And everyone who was a military commissioner at that point presented a risk to them of disclosure of what they were doing. And then he also said that there's evidence to believe that of the four other members of his family who were killed, that was by the military. And he also testified that he feared that the military was likely to take out or take revenge on his family in Guatemala, you know, because of his testimony in court here. In fact, he said that he was extraordinarily reluctant to say anything because he was deathly afraid that the military would take it out on his family in Guatemala. He, throughout the hearing, linked up his fear to the military to his risk, both personally and also to family members. I just want to add that because that was clearly from his testimony. If I did not remember certain things in the record, I apologize. I wasn't meaning to represent it. I thought that's what I remembered. But I would say that it was his burden to show that it is more likely than not that he would be tortured there. Yes, you take into account past torture. That is one factor that you do take into account. It's a significant factor, according to the case law. I mean, that's what you primarily focus on, according to the case law, isn't it? Well, you would, I think, if there is in terms of temporal limitations. Where is your authority in terms of temporal limitations? I'm not sure. That's what I'm trying to get at. I think it just makes sense. I mean, here, what happened to him is 30 years ago. It's not even clear that the military is constituted in the same way. He has to be targeted by a government or by an agency of the government. And it's his burden to prove that. It's not the government's burden to prove that he would not be. It's his burden because he's seeking protection under the convention. And so if he had more recent country reports that showed that the military was pursuing these people. But now we're 30 years later. There is no evidence that military commissioners have been tapped to provide evidence against them. There's no evidence that anyone who has been who has sought asylum and been denied asylum and testified has gone back as a military commissioner and been harmed. And so, you know, he has to show that it's more likely than not that he would be tortured by the government. And they're really after 30 years. I would say that it makes sense that something that happened to him, discreet incidents by by certain people. It while it may be certainly pro. Can you give me your best case on that? I off the top of my head. No, but I but I will certainly follow up with that. But I think that the court has to look at all of this evidence and what he's proving is when you talk about discreet evidence. And I understand they happened some time ago. I mean, we're talking 30 years. But what Judge Sessions just laid out, I mean, that's what you consider discreet incidents. Because I have I'm talking about the incidents that happened now. Well, I'm talking about the incidents that happened to him, and he doesn't link up what happened to his family members with what happened to him. None of his family members were military commissioners. And what my opponent is arguing is that or which Judge Sessions pointed out was that they were trying to quiet military commissioners. But can I just correct you? Just one small point. He he he did link up to military commissioners. His brother, who was shot, was a military commissioner. And that is why he felt that his brother was shot, because he was a military commissioner. Well, he said that your use of the word felt is exactly that what he felt. I mean, this is a country where you had a civil war. There were people being killed, being tortured, being persecuted for various reasons all over the country. It wasn't always clear why they were a target and who made them a target. But the question is, did he prove that 30 years later, if he were to return there, that the government would would seek him out and and torture him based on what he did 30 years ago? And that they're really the evidence is is not more likely than not. And that was the burden that he had to meet. Yes, it was. It was 40 years ago. But who cares about who cares about a decade or two? You know, when you get older, when you get older, a decade, it just goes by in a flash. I take that decade. I was the cycle. But where is where is the petitioner right now? Do you know? I believe he is in. He is not detained. So he is wherever he lives. I'm not sure exactly. Perhaps my opponent was living with his daughter and son in law and grandchildren in Brandywine, California. Is that it is a Brandywine, California? I don't I don't know. I think there was a stay. That was I think he can be removed at any time. Am I correct or not correct on that? Do you know? I would have to look. I think if the stay were denied, then, yes, he would be removable at any time. The stay was denied, I think. Right. So then he is subject to removal at any time. OK, I just wanted to confirm that. And so thank you very much. Thank you very much. Do you have any other questions? No. Thank you. OK, thank you. Miss Lewis, I'll just give you a minute to to wrap up and respond. I know we went way over time with both of you. Thank you, Your Honor. Thank you. Well, first of all, the the government's first point was that it's not a mixed question of one fact. But I want to point out that respondent's brief at thirty five says standard of review. The agency finding that Archilla is barred from relief is a mixed question of one fact. And citing Miranda Alvarado. And this is really important because the Novo review is much better for my clients. Second of all, you know, Ms. Eagle was talking about the fact that asylum confers citizenship and like maybe he doesn't deserve it. I don't I don't say that he doesn't. But that is her concern. So if this court only awarded convention against torture, relief or said that that was appropriate or sent back for more investigation on that in another trial, then that does not lead to citizenship. So in case you know that might influence you. Another thing is that your time is up. But I did have a question because I'm just trying to figure out the opening brief says that he was your client was removed to Guatemala. Do you know where your client is right now? I don't know. I just came in and I was only studying the record. And so I did not inquire. But I can send you a notification through pacer if you'd like. Do you want me to do that? Yeah, I'd like to know where he is. So if you could, I'd appreciate it. OK, is that anybody have any other further questions for this list? OK, thank you both very much. Very interesting case. And we appreciate the time and the oral argument presentations today. Thank you very much. The case of Edgar Archela versus William P. Barr is now submitted. And that concludes our docket for today. And so we are adjourned. Thank you. This court for this session stands adjourned.
judges: Murguia, Christen, Sessions